UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
VERNAIL BLOUNT,

               Plaintiff,

     -against-

Detective MICHAEL KELLY, Shield No.
935104; Detective PETER BOHRINGER, Tax
No. 915326; Police Officer AARON LOHMAN,
Shield No. 7378; Police Officer ERIK NELSON,
Tax No. 942266, individually and in their
official capacities,

               Defendants.
----------------------------------------------------------X

**MEMORANDUM & ORDER**
15-CV-5599(PKC)(JO)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Vernail Blount brings this action against Defendants Detectives Michael Kelly

and Peter Bohringer and Police Officers Aaron Lohman and Erik Nelson of the New York City

Police Department ("NYPD") alleging numerous violations of 42 U.S.C. § 1983, as well as New

York law, in connection with five arrests. Before the Court is Defendants' motion for summary

judgment. For the reasons stated below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

**A. Relevant Facts**[1]

       Plaintiff alleges that he was falsely arrested on five separate occasions: August 11, 2012,

September 28, 2012, June 8, 2013, July 5, 2013, and August 16, 2013. The parties agree that

Plaintiff was in fact arrested on those dates and that marijuana was vouchered in connection with

---

[1] Unless otherwise noted, a standalone citation to Defendants' 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Defendants' 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

each of these arrests.  (Defs.' 56.1, Dkt. 57-1, ¶¶ 15-16, 24, 36, 38, 52-53, 61.)  They also agree that between August 11, 2012 and August 16, 2013, Plaintiff's residence was 188-03 Hilburn Avenue, St. Albans, New York (the "Premises") (*id.* at ¶¶ 2-3)[2] and that Plaintiff kept a Pontiac, of which he was the *de facto* owner, in the driveway of the Premises (*id.* at ¶¶ 1-2).  The parties disagree, however, about the facts and circumstances leading to each of Plaintiff's five arrests.

### 1.  August 11, 2012 Arrest

On August 11, 2012, at approximately 2:50 p.m., a vehicle driven by Alicia Francis, later identified as Plaintiff's girlfriend (Deposition of Erik Nelson ("Nelson Dep."), Dkt. 57-6, at 32:16-20; Dkt. 58-4, at 3[3]), pulled into the driveway of the Premises (Defs.' 56.1, at ¶¶ 7-8).  According to Plaintiff, he got into Ms. Francis's vehicle and was sitting and talking "for probably like a good ten or 15 minutes" with Ms. Francis, who had come "to get some money to get food."  (Deposition of Vernail Blount ("Blount Dep."), Dkt. 57-5, at 314:2-7, 315:7-8; Defs.' 56.1, at ¶ 12.)  "[T]he next thing [he] kn[e]w a black car pulled up" and police officers "[s]natched my girl out, snatched me out.  [The police] [s]tarted [to] search us and I ain't have nothing on me.  [His girlfriend also] ha[d] nothing on [her] and we still g[o]t locked up."  (Blount Dep., at 315:9-13.)  He stated that the police searched his girlfriend's car but did not search the Pontiac.  (*Id.* at 315:16-24.)  He was handcuffed without incident.  (*Id.* at 317:10-16.)

By contrast, Defendant Nelson, a member of the NYPD's Queens Narcotics Unit, claims that he was parked across the street from the Premises in an unmarked police car (Defs.' 56.1, at ¶¶ 4-5, 9) and that he saw Plaintiff engage "in a narcotics transaction" with Ms. Francis (Nelson Dep., at 14:9-11).  Nelson testified at his deposition that he was parked across the street from the

---

[2] The Premises is a single-family house with a driveway.  (Defs.' 56.1, at ¶¶ 3, 7.)

[3] Except for citations to deposition transcripts, all page numbers refer to the pagination generated by the CM/ECF system and not the document's internal pagination.

Premises because the area was "narcotics prone" and part of his unit's Tactical Plan for that day.[4]

He stated that he initially saw Plaintiff "seated in the driver's seat of [the] Pontiac", and then Plaintiff got into the front passenger seat of Ms. Francis's vehicle. (*Id.* at 14:9-15:19.) After watching them for "minutes", he "[o]bserved an object being passed between the two of them." (*Id.* at 19:11-18, 29:24-25.) Specifically, Nelson remembered "U.S. currency being exchanged" and being "passed from the female to Mr. Blount", but "couldn't see" what other objects were being exchanged. (*Id.* at 30:16-25.) Nelson and his partners, Defendant Kelly and a NYPD lieutenant, then "walked over to where the car was parked in the parking lot to conduct a narcotics investigation." (*Id.* at 34:15-18.)[5] According to Nelson, he "went to the Pontiac[,] . . . and inside the Pontiac[,] [he] observed marijuana in a bag . . . on the floor of the front driver's seat area of the Pontiac." (*Id.* at 40:4-21.) In his criminal complaint, Nelson stated that "each of these recovered bags of marijuana were in open view from [Nelson's] vantage point on the public street." (Dkt. 57-9, at 2.) A quantity of marijuana was later vouchered as having been recovered from Ms. Francis's person and vehicle. (Defs.' 56.1, at ¶¶ 14-15.)

Plaintiff was charged with Criminal Sale of Marijuana in the Fourth Degree, Criminal

---

[4] According to Nelson, a Tactical Plan (or "tact plan") is a NYPD form that the Narcotics Unit uses "whenever [it] go[es] out and conduct[s] narcotics enforcement, whether buy or sell, just people that are going to be a part of the team, undercovers, different recent incidents, like violence in the precinct that we will be covering or narcotics prone areas in the precinct we'll be covering." (Nelson Dep., at 11:19-12:3.) However, Plaintiff argues that a Tactical Plan is not limited to a specific day, but rather, allows for "the regular staking-out of [a person's] home by NYPD officers." (Plaintiff's Brief ("Pl.'s Br."), Dkt. 58, at 9; Amended Complaint ("Am. Compl."), Dkt. 50, ¶¶ 26-27.)

[5] At his deposition, Detective Kelly stated that he did not see the alleged drug transaction. (Deposition of Michael Kelly ("Kelly Dep."), Dkt. 57-14, at 54:13-16.) However, this arrest was not the first time he had interacted with Plaintiff. "[M]y first recall incident [sic] with Vernail Blount, he was arrested for selling something to an undercover detective. . . . I recall there was marijuana involved but I don't recall if that was what he sold and that's the entirety of what he sold." (*Id.* at 20:25-21:4, 21:10-13.) In fact, Kelly has been involved in taking Plaintiff into custody "[a]t least five times" between 2012 and August 2013. (*Id.* at 11:4-12:10.)

Possession of Marijuana in the Fifth Degree, and Unlawful Possession of Marijuana. (Dkt. 57-9.)

He moved to suppress the drugs as fruits of an unlawful search, and on April 10, 2013, the Queens

County Criminal Court granted Plaintiff's motion. (Dkt. 58-4.) The court found Nelson's

testimony at the suppression hearing about the "hand to hand" exchange to be "pretextual"

> less as a conclusion of law than as an implicit reference to the lack of credibility of
> the Detective's testimony. However, even assuming the detective[']s testimony
> [was] deemed credible in its entirety, it would nonetheless fail to establish probable
> cause to detain, search, and/or arrest the defendant under the totality of the
> circumstances presented in this case. . . . In this case, the record is completely
> devoid of any information or evidence tending to support, even by reasonable
> inference, the detective[']s conclusion that he observed defendant engage in
> conduct associated with the 'telltale' signs of a drug transaction. There was no
> evidence, elicited at the hearing, of the defendant's residence, or the area
> surrounding defendant's residence, being a hotbed of alleged drug activity; no
> evidence of the transfer of any United States currency from one party to the other;
> and no evidence of any furtive gestures or evasive behavior on the part of the
> defendant or his girlfriend. That the detective observed the defendant, sitting in a
> vehicle parked on his own property, hand an [] unknown object to, and in turn,
> receive an unknown object from another person, without some other indicia of a
> drug transaction is insufficient to establish a reasonable suspicion of criminal
> activity.

(*Id.* at 4-5 (citations omitted).) The charges against Plaintiff were ultimately dismissed.

(Defendants' Brief, ("Defs.' Br."), Dkt. 57-2, at 11.)

### 2. *September 28, 2012 Arrest*

On September 28, 2012, Plaintiff says he was relaxing in his front yard when he was

approached by "two or three" officers, including Defendant Lohman. (Blount Dep., at 182:8-12.)[6]

Lohman said to Plaintiff, "come here A-hole", and once Plaintiff approached him, Lohman started

searching Plaintiff and his property, including his cars and the outside of the Premises. (*Id.* at

185:7-15, 187:25-188:1.) Plaintiff describes Defendant Lohman as "getting aggressive", telling

---

[6] According to Plaintiff, he recognized Officer Lohman "[t]hrough the course of the years
of [Lohman] just constantly harassing [Plaintiff]" and people in Plaintiff's neighborhood. (Blount
Dep., at 183:15-16, 19-22.)

Plaintiff to "[s]hut up", and "tearing thing[s] up" during the search. (*Id.* at 188:13-189:11.) According to Plaintiff, Lohman also searched Plaintiff's friend, who was present at the time of the arrest, and "[o]pened the door in the [Pontiac]; went in. Looked all around. Wasn't nothing there." (*Id.* at 187:18-24.) Plaintiff asserts that he was "[l]ocked up for no reason." (*Id.* at 185:9-10.)

By contrast, Defendant Lohman, a member of the NYPD's 113th Precinct Street Narcotics Enforcement Unit, stated that he was patrolling in a car when he "saw a [Pontiac] in the driveway . . . [with] two legs sticking out of it as if somebody [(who was later identified as Plaintiff)] was underneath the dashboard, which is a common thing done when somebody tries to remove parts from a vehicle or steal a car." (Deposition of Aaron Lohman ("Lohman Dep."), Dkt. 57-10, 21:20-25.) According to Lohman, he approached Plaintiff, who refused to answer any questions about what he was doing or to whom the car belonged. Lohman then "looked inside the vehicle and there's where [he] observed a loose quantity of marijuana on top of a compact disc case, and [he] placed [Plaintiff] under arrest." (*Id.* at 22:5-15.) Lohman noted in his log book that he stopped Plaintiff because of "furtive movements" and "out of reasonable suspicion" because Plaintiff was "[s]eated in [a] car with no plates and [a] broken window." (*Id.* at 27:4-12.)

Plaintiff was charged with Criminal Possession of Marijuana in the Fifth Degree. (Dkt. 57-12.) The charges against Plaintiff were ultimately dismissed. (Lohman Dep., at 42:15-22.) Plaintiff alleges that, after either this arrest or the previous August 2012 arrest, he went to NYPD's Internal Affairs Bureau ("Internal Affairs") to complain. He said that "[n]obody helped [him]" and that they "came to [his] house, took [his] phones. Erased everything. Never had no phone back. They was helping the cops. . . . [He] even tried to go to the District Attorney's office and they said get out." (Blount Dep., at 205:11-23.)[7]

---

[7] Plaintiff also claims that he spoke to the Civilian Complaint Review Board about "[a] couple of the incidents." (Blount Dep., at 333:12-25 ("They came to me. I called and they came

*3. June 8, 2013 Arrest*

Plaintiff alleges that on June 8, 2013, he was in the yard of the Premises, "[j]ust relaxing, listening to music outside in [his] yard" with approximately ten to twenty other people, when at least three police officers, including Defendants Kelly and Bohringer, approached him. (*Id.* at 68:12-16, 69:16-17:7, 74:7-11, 76:19-25, 83:19-22.) Plaintiff states that "[w]hen they came up to [him,] it was just big commotion. They start[ed] hitting [him], violating [his] rights." (*Id.* at 89:16-17.) Kelly started calling Plaintiff an "asshole" and "hitting" Plaintiff in his shoulders, head, and "upper body". (*Id.* at 93:13-94:8, 110:1-4, 123:3-19.) "[T]hey just all was just jumping on top of [him]. So it was just three against one." (*Id.* at 110:22-24.) At some point, Plaintiff was handcuffed and, according to Plaintiff, the officers continued to beat him. (*Id.* at 115:18-20.) Plaintiff estimated that the entire beating lasted "probably just for a few minutes" and resulted in a fractured left shoulder. (*Id.* at 113:14-17, 120:24-121:6.)

According to Plaintiff, he was then put in the police van and "chained up in some type of way." (*Id.* at 116:10-11.) The officers continued to "beat [him] up and put [him] in a body bag. . . . Choked [him]. [He] kept dying. [He] kept coming back to life for no reason." (*Id.* at 94:10-15.) All three officers were choking him, but "[e]specially Michael Kelly". (*Id.* at 113:4-7.) This allegedly continued "for a couple of hours" and Plaintiff got "a lot of injuries in the van." (*Id.* at 119:7-18 (claiming there were a "lot of like bumps and bruises and stuff like that [on his arms and back]. A lot of pain.").) When they arrived at the precinct, the officers "[l]iterally dragg[ed] [Plaintiff] on the ground into the precinct" with his hands cuffed behind his back. (*Id.* at 116:15-20.) At his deposition, Plaintiff testified that he could not walk because he "was out of it. I was

_____

and contacted me. . . . I feel like I was getting a spin. I feel like I was getting spinned around. I made my complaints. Nobody helped me.").)

out.  I got beat up.  They took me for a van ride and in the van—inside of the van is no seat belts or nothing.  So I'm just in there. . . . If they going 50 [miles per hour] and they stop, I'm hitting the wall, like, boom[.]"  (*Id.* at 118:6-10.)  Plaintiff was then placed in a cell at the precinct with the handcuffs still on.  He asked an officer if he could go to the hospital and, in response, the officer "started jumping [him] . . . [t]hen ten cops", including the three officers that arrested him, "they c[a]me and jump[ed] [him] and . . . put [him] in a body bag. . . [d]ropping mace in [his] eyes . . . [and] put[ting] [his] face in the toilet.  [Plaintiff was] just yelling. . . [and then] passed out. [He] woke up in the hospital[.]"  (*Id.* at 128:23-129:9; 130:12-144:6.)

At the hospital, Plaintiff states that the doctors "bandaged [his fractured left] arm up" in a soft cast, put him on an IV, gave him Motrin, and kept him overnight for observation.  (*Id.* at 144:11-18, 146:3-15, 148:23-25.)  Hospital records show that Plaintiff reported that "he was assaulted by NYPD in his home" and that "his head was pushed into a wall and he was dazed afterwards."  (Dkt. 59-1, at 1, 6.)  He also stated that he was nauseous and had "mild" to "moderate"—5 to 7 out of 10—pain in his head and extremities.  (*Id.* at 1, 4-5.)  A physical examination showed tenderness and swelling in the left forearm and left wrist, as well as abrasions on the right lower leg, but further testing revealed no fractures or dislocations.  (*Id.* at 6, 28, 31.) Plaintiff was given Percocet for pain and his left hand was put in a soft cast.  (*Id.* at 6, 32.)  He appeared awake, alert, and oriented during a neurological examination, and all testing was "unremarkable."  (*Id.* at 5, 21, 30.)

Defendant Kelly and another one of the arresting officers were with Plaintiff at the hospital. (Blount Dep., at 149:1-9.)  According to Plaintiff, Defendant Kelly "told [Plaintiff] to stop complaining" and "was cursing. . . calling [Plaintiff] names."  (*Id.* at 149:12-18.)  Plaintiff told Kelly that he "was going to call Internal Affairs on [Kelly]", and Kelly proceeded to "choke[]

[Plaintiff] in the hospital" and told Plaintiff to "[s]hut the fuck up." (*Id.* at 149:20-23, 150:7-8.) Plaintiff states that he began to "scream[] [at] the top of [his] lungs", and hospital security came to remove Kelly from on top of him. (*Id.* at 150:15-23.) Kelly then left the hospital and another officer stayed with Plaintiff for the rest of the night. (*Id.* at 151:2-10.)

By contrast, Detective Kelly states that he was near the Premises on June 8, 2013 because Plaintiff's address was on the Tactical Plan and that he arrested Plaintiff that day after observing him sell marijuana to two separate individuals. (Kelly Dep., at 27:16-28:16, 30:5-31:15, 32:19-21.)[8]  In the first transaction, which allegedly occurred within minutes of Kelly starting his observation of the Premises, Kelly saw Plaintiff get out of the driver's seat of the Pontiac where he was then approached by the alleged drug buyer. The buyer "dropped a sum of United States currency into the driver's seat of the [Pontiac]" and then "grabbed [a] ziplock bag containing marijuana from [the Pontiac]." (*Id.* at 31:13-15; Dkt. 57-19, at 2.) Kelly then arrested the buyer—out of Plaintiff's sight—who "admitted in sum and substance . . . [that he] told [Plaintiff] [he] wanted one [bag of marijuana], [Plaintiff] said drop the money in the car, and [the buyer] took one [bag]." (Dkt. 57-19, at 2.) During the second transaction that Kelly observed that day, he saw Plaintiff inside the Pontiac and the buyer "seated in the passenger seat". (*Id.*) He then "observed [the buyer] approach [the Pontiac] and hand [Plaintiff] a sum of United States currency and that [Plaintiff] handed [the buyer] a ziplock bag containing a quantity of marijuana." (*Id.*) After he arrested Plaintiff, Kelly then searched the Pontiac where he found "greater than two ounces" of marijuana "in the front floor of the [Pontiac]" in "48 ziplock bags". (*Id.*; Kelly Dep., at 49:6-8, 18-22; 50:3-11.) Kelly also recovered $398 in cash from Plaintiff's pants pocket. (Dkt. 57-19, at

---

[8] Although Bohringer was at the Premises and assisted in arresting Plaintiff on June 8, 2013, he did not observe the alleged drug transactions. (Deposition of Peter Bohringer, Dkt. 57-15, at 32:10-12.)

2.)

With respect to the arrest itself, Kelly testified in his deposition that when he and his partners approached Plaintiff and announced themselves as police, Plaintiff, who "was sitting in the [the green Pontiac] that was in the driveway, got out of the vehicle and charged on [Kelly] and [Bohringer]." (Kelly Dep. at 38:11-19, 40:16-41:23, 42:5-13.) The officers "repeatedly" instructed Plaintiff that "he was under arrest and [to] stop resisting" (*id.* at 41:24-42:4), but, according to Bohringer, Plaintiff "refus[ed] to put his hands behind his back", and instead "placed his arms in front of his body, tightened them up so that [the officers] could not grab them to put his hands behind his back" (Deposition of Peter Bohringer ("Bohringer Dep."), Dkt. 57-15, at 33:7-10, 33:20-25). The officers then grabbed Plaintiff's arms, put on the handcuffs, and placed Plaintiff in the prisoner van. (Kelly Dep., 41:24-42:4, 45:14-46:5.) Bohringer stated that he does not know whether Plaintiff was injured during the handcuffing. (Bohringer Dep., at 35:4-7.) Kelly also stated that Plaintiff did not complain of any injuries before being placed in the prisoner van. (Kelly Dep., at 54:22-55:3.) Although Kelly later became aware that Plaintiff was complaining of arm pain, he testified at his deposition that he "knew for a fact that [Plaintiff's] arm wasn't broken . . . [b]ecause [Plaintiff] was taken to the hospital and x-rayed." (*Id.* at 71:12-72:14.) Both officers denied any force being used during the arrest and stated that they did not interact with Plaintiff at the precinct. (*Id.* at 56:9-16, 57:20-24.)

Plaintiff was charged with Resisting Arrest, Criminal Possession of Marijuana in the Fourth Degree, and two counts of Criminal Sale of Marijuana in the Fourth Degree. (*See* Dkts. 57-17, 57-19.) The charges against Plaintiff were ultimately dismissed. (Defs.' Br., at 11.)

### 4. July 5, 2013 Arrest

Plaintiff alleges that on July 5, 2013, he was riding his bike in front of the Premises, heading

out of the driveway, when the "police just came and hit [him] with [their] van out of nowhere." (Blount Dep., at 221:15-19, 222:20-23.)  He stated that "three or four" officers in plainclothes, including Defendant Kelly, got out of the van, picked him up off the ground, and arrested him. (*Id.* at 235:9-24.)  The officers then searched Plaintiff's yard, his person, and his car but "[d]idn't find anything." (*Id.* at 237:9-18.)  Plaintiff was taken to the hospital, where he was diagnosed with "a shoulder injury" and "a few bumps and bruises [on his right side]", given a sling and pain medication for his shoulder, and kept overnight for observation.  (*Id.* at 239:16-18, 240:10-24.) Hospital records show that Plaintiff reported being in a "motor vehicle traffic accident involving collision with pedestrian injuring motorcyclist", that he was given ice, and that he was told to take Motrin for pain.  (Dkt. 59-2.)

By contrast, Defendant Kelly stated that he and two other officers were at the Premises again because Plaintiff's residence was on the day's Tactical Plan.  (Kelly Dep., at 60:8-9, 75:18-23.)  According to Kelly, after "[o]nly a few minutes" of observation, he saw "Blount sell marijuana to another individual".  (*Id.* at 60:19-61:4.)  At his deposition, Kelly testified that there was a "[woman] . . . inside the green Pontiac along with [Plaintiff] at the time of the hand-to-hand transaction and marijuana was found inside [the] vehicle." (*Id.* at 77:2-5.)  Another member of Kelly's field team then apprehended the buyer and confirmed that she was in possession of marijuana.  Kelly then decided to arrest Plaintiff, who had ridden away on his bicycle.  (*Id.* at 62:16-24.)  The officers "proceeded to follow [Plaintiff] [a block or two], attempted to find a location that was not heavy in . . . traffic, pulled up next to him and requested him to stop and identified [them]selves as police." (*Id.* at 63:3-10.)  However, in the criminal complaint, Kelly stated that he saw Plaintiff sitting in the Pontiac when the buyer "approach[ed] the driver's side window . . . and hand[ed] [Plaintiff] a sum of United States currency in exchange for a black

ziplock bag of marijuana." (Dkt. 57-24, at 2.) Kelly then approached Plaintiff who "fled the scene and . . . thr[e]w a sum of United States currency and a quantity of marijuana onto the ground." (*Id.*; *see also* Dkt. 57-22, at 1 (stating that Plaintiff "did flee police and did destroy [United States currency] and a quantity of marijuana")).)

According to Kelly, Plaintiff's bike "glanced against the front end of [the police] vehicle" when Plaintiff "tried to cut in front of it". (Kelly Dep., at 65:18-66:10.) "At a certain point [Plaintiff] was no longer on the bike. Members of the field team attempted to get on either side of [Plaintiff] to prevent escape and with a certain amount of effort he was taken under custody." (*Id.* at 66:16-21.) While they were arresting Plaintiff, "[he] was shouting to members of the gathering neighborhood that [Kelly] was after him, me specifically, Detective Kelly, that his arm was broken and [Kelly] was still putting handcuffs on him anyway and that he broke his arm the last time that [the police] arrested him." (*Id.* at 70:22-71:10.)

Plaintiff was charged with Attempted Tampering with Physical Evidence, Resisting Arrest, Criminal Sale of Marijuana in the Fourth Degree, and Criminal Possession of Marijuana in the Fifth Degree. (*See* Dkt. 57-24.) The charges against Plaintiff were ultimately dismissed. (Defs.' Br., at 11.) According to Plaintiff, after this arrest, he complained to Internal Affairs and they came to his house to speak with him for "20, 30 minutes", but "[f]rom there I never heard nothing else." (Blount Dep., at 255:16-256:8.)

*5. August 16, 2013 Arrest*

Plaintiff alleges that on August 16, 2013, he was leaving his house to visit his mother when Defendants Kelly and Bohringer "came over to [him], put the handcuffs on [him,] and locked [him] up for no reason." (*Id.* at 265:12-19.) During the ride to the precinct, "[t]hey just start roughing [Plaintiff] up and tightening the cuffs" and then at the precinct, "they was . . . talking a lot of smack

trying to be physical with [him]. . . . Trying to rough [him] up, push [him], and stuff like that" and pulling him by his shoulders and arms. (*Id.* at 275:13-22, 276:6-17, 277:8-13, 278:3-21.) Plaintiff did not recall whether he went to the hospital following his arrest. (*Id.* at 277:20-23.)

By contrast, Bohringer claims that he observed Plaintiff for a "couple of minutes" outside the Premises and saw that he was "engaged in drug activity . . . selling drugs." (Bohringer Dep., at 55:17-24, 57:5-16, 79:15-20.) Plaintiff gave a buyer "a quantity of marijuana" in exchange for "a sum of United States currency." (Dkt. 57-27, at 1.) An undercover officer then arrested the buyer and "recovered two ziplock bags each containing a quantity of marijuana." (*Id.*) The undercover officer also told Bohringer that he observed Plaintiff give a second individual a ziplock bag "containing a quantity of marijuana." (*Id.*) Defendant Kelly then arrived with the prison van after Plaintiff "had already been apprehended by other members of the field team." (Kelly Dep., at 87:16-20.)[9]

Plaintiff was charged with two counts of Criminal Sale of Marijuana in the Fourth Degree. (*See* Dkt. 57-27.) The charges against Plaintiff were ultimately dismissed. (Defs.' Br., at 11.)

### B. Procedural History

Plaintiff filed his initial complaint on September 28, 2015 (Dkt. 1) and his Amended Complaint on May 11, 2017 (Dkt. 50).[10] Defendants filed their motion for summary judgment on

---

[9] According to Kelly, Plaintiff was "[b]elligerent" at the scene and once he saw Kelly, "kept shouting to everybody that Detective Kelly was after him." (*Id.* at 88:20-89:10.) At the precinct, Plaintiff "was inside a cell screaming, banging against the bars." (*Id.* at 90:24-91:2.) The officers designated Plaintiff as an "emotionally disturbed person" and called emergency services for assistance. (*Id.* at 91:24-95:20.) Emergency workers "instructed [Plaintiff] to calm down", "placed [him] into a restraining device", and transported him to the hospital. (*Id.* at 93:2-95:13.)

[10] It is notable that, at his deposition, Plaintiff testified that he has been arrested at least twice for similar drug charges after filing the instant lawsuit as "retaliation" for bringing this action. (*See* Blount Dep., at 292:4-295:22, 297:2-12.) He alleges that Defendants' "friends[,] . . . some of the officers that . . . I seen them before[,] . . . c[o]me bothering me. They c[o]me right to me, the same way [Defendant Nelson] did in the first arrest. See me and my girlfriend sitting in

November 3, 2017. (Dkt. 57.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166-67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted; alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).

---

the car. What are you doing. Just come snatch me out the car, lock me up for no reason." (*Id.* at 292:9-15.) Additionally, according to Plaintiff, the day before his July 29, 2016 deposition, officers from Defendants' precinct "came to [his] house just asking questions; said they had a call and complaint." (*Id.* at 12:20-13:9.)

In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

## DISCUSSION

## I.     August 11, 2012 Arrest (Second Claim[11] - Defendant Nelson)

Plaintiff's sole federal claim with respect to his arrest on August 11, 2012 is for malicious prosecution, in violation of 42 U.S.C. § 1983, against Defendant Nelson. (Amended Complaint ("Am. Compl."), Dkt. 50, at ¶¶ 101-06.) In order to sustain a Section 1983 claim for malicious prosecution, a plaintiff "must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted). A plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (quoting *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)). Defendants concede that all of the proceedings related to Plaintiff's arrests were terminated in Plaintiff's favor. (Defs.' Br., at 11.) Therefore, the Court will only address the other three factors.

First, Nelson's signed sworn criminal complaint against Plaintiff is sufficient to satisfy the

---

[11] The Court uses the "Claim" numbers from Plaintiff's Amended Complaint. (Dkt. 50.)

first factor. (Dkt. 57-9.) "An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) (collecting cases); *see also Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments). Second, there is a genuine dispute of material fact as to whether Nelson had probable cause for Plaintiff's arrest and prosecution. As the state court clearly articulated at the suppression hearing, there was a "lack of credibility" with respect to Nelson's testimony about the circumstances leading to Plaintiff's arrest and "even assuming the detective[']s testimony were deemed credible in its entirety, it would nonetheless fail to establish probable cause to detain, search, and/or arrest the defendant under the totality of the circumstances presented in this case[.]" (Dkt. 58-4, at 4-5.) Finally, there is also a genuine dispute of material fact as to whether there was actual malice as a motivation for defendant's actions because "[a] lack of probable cause generally creates an inference of malice." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996). Therefore, Defendant Nelson's motion for summary judgment is denied as to the Second Claim of Plaintiff's Amended Complaint alleging malicious prosecution against Nelson stemming from the August 11, 2012 arrest.

## II.     September 28, 2012 Arrest (Fourth through Seventh Claims - Defendant Lohman)

### A.   Illegal Stop and Frisk (September 28, 2012)

The Court reads Plaintiff's papers as raising a Section 1983 claim based on a Fourth Amendment violation of unlawful search and seizure against Defendant Lohman in connection with Lohman's initial approach of Plaintiff on September 28, 2012. In *Terry v. Ohio*, the Supreme Court "established that the Fourth Amendment does not prohibit the police from stopping a person

for questioning when the police have a reasonable suspicion" that criminal activity is afoot. *Brown v. City of Oneonta, New York*, 221 F.3d 329, 340 (2d Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 24-27 (1968)). Reasonable suspicion consists of "a particularized and objective basis for suspecting the particular person of criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also U.S. v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006). "To prevail on a § 1983 claim under the Fourth Amendment based on an allegedly unlawful *Terry* stop, a plaintiff must prove that he was seized. . . . [A] seizure . . . occur[s] when by means of physical force or show of authority, a police officer detains a person such that a reasonable person would have believed that he was not free to leave." *Brown*, 221 F.3d at 340 (citations and internal quotation marks omitted). Relevant factors identifying a police seizure can include "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects . . . and a request by the officer to accompany him to the police station or a police room." *Id.* (quoting *United States v. Hooper*, 935 F.2d 484, 491 (2d Cir. 1991)). Additionally, even "[i]f plaintiff[] ultimately prove[s] [his] claim for unreasonable search and seizure, [he is] entitled only to damages resulting directly from the invasion of privacy and not from the discovery of the [incriminating evidence] and the ensuing arrests and prosecution." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 432 (E.D.N.Y. 2012).

Drawing all reasonable inferences in Plaintiff's favor, there is a genuine dispute of material fact as to whether Plaintiff was seized and as to whether there was reasonable suspicion to stop him in the first instance. Plaintiff alleges he was approached by "two or three" officers who cursed at him and were "getting aggressive", that the officers began to search his property and vehicles without permission or cause, and that they were "tearing thing[s] up" during the search. (Blount

Dep., at 182:8-12, 185:7-15, 187:25-188:1, 188:13-189:11.)  This "physical force or show of authority" is sufficient to create a genuine dispute as to whether Plaintiff was seized and detained.

Furthermore, if the events as described by Plaintiff are true, and Plaintiff was only handcuffed and arrested after Detective Lohman searched his car, "the search was illegal, and . . . resulted in an improper arrest." *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 578 (S.D.N.Y. 2002). Plaintiff also denies being near the Pontiac (Blount Dep., at 180:21-23, 181:3-8), which Lohman cited as the basis for stopping Plaintiff (Lohman Dep., at 27:4-12).  While Defendant Lohman portrays the encounter in an entirely different light,

> [i]n considering a motion for judgment as a matter of law, the district court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."

*Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (quoting *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000)) (emphasis omitted).  Since "there are genuine issues of material fact regarding the lawfulness of the initial search of [Plaintiff's] person", *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 608 (S.D.N.Y. 2013), and Plaintiff has "adequately allege[d] damages attributable to the detention during the initial vehicle stop and search, including psychological and emotional trauma, restriction of liberty, fear for [his] safety, . . . and humiliation," *Matthews*, 889 F. Supp. 2d at 432, as well as physical damage to his car, *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999), Defendant Lohman's motion for summary judgment is denied as to the Seventh Claim of the Amended Complaint alleging unlawful search and seizure in connection with the September 28, 2012 arrest.

## B. False Arrest (September 28, 2012)

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); *see also Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852). To prevail on a claim of false arrest or unlawful imprisonment, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (internal quotation marks and citation omitted). "'[T]he existence of probable cause' for an arrest 'is an absolute defense to a false arrest claim.'" *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)); *see also White v. City of New York*, No. 15-CV-3321 (PKC)(RER), 2018 WL 1545676, at *4 (E.D.N.Y. Mar. 29, 2018).

The only disputed issue with respect to Plaintiff's September 28, 2012 false arrest claim is whether there was probable cause for the arrest. "Although the existence of probable cause must be determined with reference to the facts of each case, in general '[p]robable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *Manganiello*, 612 F.3d at 161 (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). The existence of probable cause "must be determined by reference to the totality of the circumstances", *id.*, and "may be determined as a matter of law provided there is no factual dispute regarding the pertinent events and the knowledge of the officers[,]" *Jackson v. City of New York*, 939 F. Supp. 2d 235, 249

(E.D.N.Y. 2013).

Here, there is a genuine dispute of material fact regarding the "pertinent events" that led to Plaintiff's arrest on September 28, 2012. Most importantly, Plaintiff denies being in the Pontiac at the time that Defendant Lohman allegedly saw Plaintiff under the dashboard and making "furtive movements". (Lohman Dep., at 27:4-12.) According to Plaintiff, he might have been in the Pontiac earlier in the day on September 28, 2012, but denies that he would have been at the time he was arrested. (Blount Dep., at 180:20-181:8.)[12] He also denies having or selling the marijuana that Officer Lohman purportedly found in the Pontiac. (*Id.* at 42:24-43:5, 281:16-18.) Therefore, the Court finds that genuine issues of fact exist and a reasonable jury could find that Defendant Lohman lacked probable cause to arrest Plaintiff. *Graham v. City of New York*, 928 F. Supp. 2d 610, 615 (E.D.N.Y. 2013). Defendant Lohman's motion for summary judgment is denied as to the Fourth Claim of the Amended Complaint alleging false arrest on September 28, 2012.

### C. Malicious Prosecution (September 28, 2012)

Although Defendant Lohman did not sign a criminal complaint with respect to the September 28, 2012 arrest, he did sign a "supporting deposition" referred to in the criminal complaint. (Dkt. 57-12.) This is sufficient to satisfy the "initiation" prong. *See Li*, 246 F. Supp. 3d at 605. Moreover, as described above, there is a genuine question as to whether Lohman had probable cause to arrest Plaintiff, and, consequently, there is also a genuine issue of material fact as to whether there was actual malice. *Boyd*, 336 F.3d at 78. Defendant Lohman's motion for summary judgment is denied as to the Sixth Claim of the Amended Complaint alleging malicious prosecution in connection with the September 28, 2012 arrest.

---

[12] Plaintiff also testified at his deposition that "[t]he car never was driven. It was just sitting there." (Blount Dep., at 48:9-10, 54:5-8.) While Plaintiff stated that once a week he would start the car to maintain the battery, he otherwise only looked inside of it "to make sure everything was good. That's it. To check the car." (*Id.* at 55:24-56:20.)

*D. Malicious Abuse of Process*

Under state and federal law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (quoting *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir. 1994)). However, "[n]either retaliation nor a malicious motive . . . is a sufficient collateral objective to satisfy that element of a cognizable malicious abuse of process claim." *Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013). A "collateral objective" is "usually characterized by personal animus," *Jovanovic v. City of New York*, 04-CV-8437 (PAC), 2010 WL 8500283, at *9 (S.D.N.Y. Sept. 28, 2010), *aff'd*, 486 F. App'x 149 (2d Cir. 2012) (citation omitted), and may include "infliction of economic harm, extortion, blackmail [or] retribution[,]" *Brandon v. City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010). In other words, "[a]buse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates." *Krebs v. United States*, 98-CV-2590 (MBM), 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999).

Plaintiff states that Officer Lohman's "collateral objective" was, *inter alia*, to "arrest persons known to be innocent to improve the stop-and-frisk and arrest numbers of the NYPD". (Am. Compl. ¶ 120.) Assuming without deciding that such a purpose constitutes a collateral objective for purpose of an abuse of process claim,[13] Plaintiff has put forth no evidence

---

[13] The Court notes, however, that district courts in this Circuit have consistently found that inflating arrest statistics does not satisfy the collateral objective element. *See, e.g.*, *Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) (holding that "collateral objectives" such as "obtain[ing] credit for an additional arrest" and "allow[ing] [the officers] to obtain additional overtime," failed to allege a plausible malicious abuse of process claim); *Nieves v. Fahmy*, No. 15-CV-7297 (AMD)(ST), 2017 WL 496067, at *2 (E.D.N.Y. Feb. 6, 2017) ("[Plaintiffs] claim that

establishing this improper motive. Plaintiff states that "the history of the Narcotics Borough Queens, to which Defendants . . . belonged, planting evidence on arrestees in order to increase arrest numbers", the listing of Plaintiff's private residence on an NYPD Tactical Plan, and his frequent arrests are "suggestive of an ulterior motive, for which Plaintiff was singled out as an easy target." (Pls.' Br., at 18.) However, Plaintiff does not present any evidence that Defendants had any personal involvement in the prior planting of evidence or, in this case, placing Plaintiff's residence on the Tactical Plan. (*See, e.g.*, Kelly Dep., at 27:23-28:7 ("I don't remember whose particular decision it was" to put Plaintiff on June 8, 2013 tact plan); Dkt. 58-3, at 2 (copy of June 8, 2013 tactical plan prepared by non-party Sergeant Forgione).) "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Allen v. Antal*, 665 F. App'x 9, 14 (2d Cir. 2016) (citation and internal quotation marks omitted).[14] Therefore, Defendant Lohman's motion for summary judgment is granted as to the Fifth Claim of the Amended Complaint alleging malicious prosecution in connection with the September 28, 2012 arrest.

### III. June 8, 2013 Arrest (Ninth through Fourteenth Claims - Defendants Kelly and Bohringer)

#### A. Illegal Stop and Frisk (June 8, 2013)

Although Plaintiff's Amended Complaint states that Defendants Kelly and Bohringer

---

the defendants made the arrest so that they could incur overtime, and thus get paid more money. Even if this were true, however, it does not establish an improper purpose."); *Walker v. City of New York*, No. 14-CV-808 (ER), 2015 WL 4254026, at *5 (S.D.N.Y. July 14, 2015) (finding no abuse of process claim "[e]ven assuming that Defendants arrested, detained, and charged Plaintiff in order to avoid being disciplined and to gain overtime compensation").

[14] While Plaintiff stated during his deposition that he recognized Officer Lohman on the day of the arrest because Lohman had previously harassed Plaintiff and people in Plaintiff's neighborhood on a constant basis (Blount Dep., at 183:15-16, 19-22), he does not allege that any such personal animus was the basis for Lohman arresting him on September 28, 2012.

"searched Plaintiff's person and vehicle" before he was arrested (Am. Compl. ¶ 42), there is no evidence in the record to support this claim (*see* Def.'s 56.1, at ¶ 38). Therefore, the Court will only address whether the search of Plaintiff's person and car *after* his arrest constituted an unlawful search.

Even though, as discussed *infra*, there is a genuine dispute of fact as to whether probable cause existed to arrest Plaintiff, Plaintiff's claim fails because he "has not identified any harm that he suffered from the pat down [or search of his car] to separate it from his general loss of liberty due to the arrest." *Faraone v. City of New York*, No. 13-CV-9074 (DLC), 2016 WL 1092669, at *4 (S.D.N.Y. Mar. 21, 2016). Under Section 1983, "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." *Townes*, 176 F.3d at 148. Here, the only harm Plaintiff alleges is the discovery of incriminating evidence, *i.e.*, marijuana and cash, during the search incident to his arrest, and not any separate harm arising out of the alleged deprivation of liberty. Therefore, Defendants Kelly and Bohringer's motion for summary judgment is granted as to the Twelfth Claim of the Amended Complaint alleging unlawful search and seizure in connection with the June 8, 2013 arrest.

## B. False Arrest (June 8, 2013)

There is a genuine dispute of material fact regarding the "pertinent events" and probable cause that led to Plaintiff's arrest for marijuana possession and sale on June 8, 2013. *Jackson*, 939 F. Supp. 2d at 249. Plaintiff claims that he was beaten and arrested by both Defendants for no discernible reason and, in fact, was never told why he was arrested. (Blount Dep., at 114:21-22.)

He also denies being in the Pontiac where Kelly allegedly saw Plaintiff engage in two drug transactions. (Kelly Dep., at 30:5-32:21.) As Plaintiff stated in his deposition, "[t]he only time I remember touching that Pontiac is when the police beat me up on that Pontiac." (Blount Dep., at 73:23-74:3.) He also denies possessing or selling the marijuana that Defendants purportedly found. (*Id.* at 42:24-43:5, 281:16-18.) Therefore, Plaintiff's June 8, 2013 false arrest claim based on the charge of marijuana possession and sale survives summary judgment.

In light of the fact that there is a question about the existence of probable cause to arrest Plaintiff for marijuana possession and sale, his false arrest claim with respect to resisting arrest also survives. "Under New York law, an essential element of the offense of resisting arrest is that the arrest allegedly resisted was 'authorized.' To be 'authorized' . . . , an arrest must either have been made pursuant to a warrant or have been based on probable cause." *Weyant*, 101 F.3d at 855 (citing N.Y. Penal Law § 205.30). No genuine issue of material fact exists as to whether Plaintiff intentionally attempted to prevent his own arrest. (Defs.' 56.1, ¶ 37.) The video of the June 8, 2013 arrest shows Plaintiff "actively resisting arrest". (Defs.' Br., at 28; Dkt. 57-16.) However, genuine issues of material fact exist as to whether Kelly and Bohringer "had probable cause to arrest [Plaintiff] for some independent crime at the time [Plaintiff] resisted." *Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003). Therefore, Plaintiff's false arrest claim based on the charge of resisting arrest survives summary judgment.

Accordingly, Defendants Kelly and Bohringer's motion for summary judgment is denied as to the Ninth Claim of the Amended Complaint alleging false arrest on June 8, 2013.

### C. Excessive Force (June 8, 2013)

Excessive force claims are analyzed under the Fourth Amendment "reasonableness" standard. *Kerman v. City of New York*, 261 F.3d 229, 238-39 (2d Cir. 2001). "A determination of

reasonableness under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* at 239 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Evaluation of a particular use of force "must be . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). To determine whether the officers' actions were reasonable, "the fact finder must pay careful attention to the facts of the case, including: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspects were] actively resisting arrest or attempting to evade arrest by flight.'" *Henry v. City of New York*, No. 02-CV-4824 (JSM), 2003 WL 22077469, at *2 (S.D.N.Y. Sept. 8, 2003) (quoting *Graham*, 490 U.S. at 396).

Defendants argue that Plaintiff has not demonstrated sufficiently serious injury to support a claim for excessive force and that Defendants used a reasonable amount of force to effect Plaintiff's arrest. (Defs.' Br., 25-27 (collecting cases).) As discussed, Defendants are correct that the video of the June 8, 2013 arrest shows Plaintiff "actively resisting arrest"; it also "contradicts Plaintiff's account of events that as soon as the officers approached him they began beating him." (Defs.' Br., at 28; Dkt. 57-16.) Nonetheless, there is still a genuine dispute of fact as to whether Defendants' use of force was reasonable. According to Plaintiff, three officers, including Detective Kelly, grabbed him, hit him on his shoulder, head, and upper body, and choked him, and that Plaintiff "took blows from everywhere," including to his head, feet, ankles, back, and shoulders.[15] Plaintiff contends that he was beaten continuously, placed in a body bag in the back of a police van, and then driven around for hours while he slammed back and forth into the van

---

[15] The video does not capture the entire encounter and, therefore, does not contradict Plaintiff's account about being beaten at some point during the incident.

walls.  Plaintiff avers that by the time he arrived at the precinct, he could not walk on his own and that he was then put into a holding cell, approached by ten officers, who were "punching, kicking, [and] hitting" him, and then dropped "mace droplets" into his eyes.  Plaintiff further claims he was put back into a body bag at the precinct and that officers picked him up and dunked his head in a toilet.  Plaintiff claims that he blacked out from pain and woke up in the hospital.

The parties do not dispute that, if these allegations are true, the officers' actions were unreasonable and excessive.  Instead, Defendants argue that "[a] lack of injury supports a finding that there was no excessive force employed."  (Defs.' Br., at 25-26.)  Contrary to Defendants' argument, however, the Supreme Court has recognized in the Eighth Amendment context that "[w]hen prison officials maliciously and sadistically use force to cause harm[,] . . . contemporary standards of decency always are violated[,] . . . whether or not significant injury is evident." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). This is similarly true in the Fourth Amendment context.  *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising.") (citation omitted); *see also Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.").  Therefore, even if the Court construes the injuries that Plaintiff sustained on June 8, 2013—*i.e.*, abrasions and tenderness in his left arm, wrist, and hand requiring a soft cast—as "minor" injuries, that is an insufficient basis on which to grant summary judgment, because there is a genuine dispute about how much force was used.  *See Felmine v. City of New York,* No. 09-CV-3768 (CBA)(JO), 2011 WL 4543268, at *20 (E.D.N.Y. Sept. 29, 2011) ("Crediting the allegations in the plaintiff's deposition,

and recognizing the ambiguity as to the source of the injuries documented in the medical records, the Court cannot conclude as a matter of law that no rational trier of fact could find that the defendants used an unreasonable amount of force[.]").  As a result, Defendants Kelly and Bohringer's motion for summary judgment is denied as to the Thirteenth Claim of the Amended Complaint alleging excessive force in connection with the June 8, 2013 arrest.

### D.  Malicious Prosecution (June 8, 2013)

#### i.  Detective Kelly

As an initial matter, Defendant Kelly's signed sworn criminal complaint against Plaintiff is sufficient to satisfy the "initiation" prong.  (Dkt. 57-19.)  Moreover, as described above, there is a genuine question as to whether Kelly had probable cause to arrest Plaintiff.  Therefore, there is also a genuine issue of material fact as to whether there was actual malice.  *Boyd*, 336 F.3d at 78. Defendant Kelly's motion for summary judgment is denied as to him for the Eleventh Claim of the Amended Complaint alleging malicious prosecution.

#### ii.  Detective Bohringer

In contrast to Detective Kelly, Plaintiff presents no evidence that Detective Bohringer participated in "the initiation or continuation of a criminal proceeding against plaintiff".  *Murphy*, 118 F.3d at 947.  Plaintiff does not allege that Bohringer "had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint" related to this arrest.  *Ying Li*, 246 F. Supp. 3d at 605; (*see also* Defs.' Br., at 15.)  Therefore, Defendant Bohringer's motion for summary judgment is granted as to the Eleventh Claim of the Amended Complaint as to Bohringer.

### E.  Malicious Abuse of Process (June 8, 2013)

For the reasons stated in Section II(D), Defendants Kelly and Bohringer's motion for

summary judgment is granted as to the Tenth Claim of the Amended Complaint.

   *F. Deliberate Indifference to Plaintiff's Medical Needs (June 8, 2013)*

   Plaintiff has withdrawn the Fourteenth Claim of the Amended Complaint.  (Pl.'s Br. at 21.)

**IV.    July 5, 2013 Arrest (Sixteenth through Twentieth Claims - Defendant Kelly)**

   *A. False Arrest (July 5, 2013)*

   There is a genuine dispute of material fact regarding the "pertinent events" and probable cause that led to Plaintiff's arrest.  Plaintiff denies that he was near the Pontiac or engaging in the drug transactions that Defendant Kelly purportedly witnessed and that formed the basis for Plaintiff's arrest.  Additionally, as described *supra*, there are serious inconsistencies between Defendant Kelly's deposition and the criminal complaint as to what occurred before Plaintiff's arrest, both with respect to the alleged drug sales and when in the encounter the police identified themselves to Plaintiff.  (*Compare* Kelly Dep., at 62:16-63:10, 77:2-5 *with* Dkts. 57-22, 57-24.) In light of the fact that there is a genuine factual dispute about the existence of probable cause to arrest Plaintiff for the marijuana possession and sale, his false arrest claim with respect to resisting arrest also survives.  *Weyant*, 101 F.3d at 855.  Therefore, Defendant Kelly's motion for summary judgment is denied as to the Sixteenth Claim of the Amended Complaint alleging false arrest on July 5, 2013.

   *B. Illegal Stop and Frisk (July 5, 2013)*

   For substantially the same reasons stated in Section III(A), Defendant Kelly's motion for summary judgment is granted as to the Nineteenth Claim of the Amended Complaint alleging illegal stop and frisk in connection with the July 5, 2013 arrest.  (*See* Blount Dep., 254:23-255:8, 259:7-260:24; Am. Compl. ¶¶ 63-67, 192-96.)

### C. Excessive Force (July 5, 2013)

As with the June 8, 2013 arrest, Defendants argue that the minor nature of the injuries Plaintiff sustained as a result of his arrest on July 5, 2013 defeats his excessive force claim. (Defs.' Br., 25-27.) For the reasons stated in Section III(C), Defendant Kelly's motion for summary judgment is denied as to the Twentieth Claim of the Amended Complaint alleging excessive force in connection with the July 5, 2013 arrest.

### D. Malicious Prosecution (July 5, 2013)

As with Plaintiff's malicious prosecution claim based on the June 8, 2013 arrest, the record shows that Defendant Kelly swore out a criminal complaint relating to Plaintiff's July 5, 2013 arrest, thereby initiating the criminal process. For the reasons stated in Section III(D)(i), Defendant Kelly's motion for summary judgment is denied as to the Eighteenth Claim of the Amended Complaint alleging malicious prosecution in connection with the July 5, 2013 arrest.

### E. Malicious Abuse of Process (July 5, 2013)

With this respect to this claim, Plaintiff alleges only that Detective Kelly's collateral objective with respect to the July 5, 2013 arrest and prosecution was to falsely inflate the NYPD's arrest and stop-and-frisk numbers. For the reasons stated in Section II(D), Defendant Kelly's motion for summary judgment is granted as to the Seventeenth Claim of the Amended Complaint alleging malicious abuse of process in connection with the July 5, 2013 arrest.[16]

---

[16] The Court notes that, in his deposition, Plaintiff stated that he told Kelly during the June 8, 2013 arrest that he "was going to call Internal Affairs on [Kelly]" and, in response, Kelly "choked [Plaintiff] in the hospital" and told Plaintiff to "[s]hut the fuck up." (Blount Dep., at 149:20-23, 150:7-8.) While this could potentially constitute "personal animus" to establish a malicious abuse of process claim related to the subsequent July 5, 2013 arrest, Plaintiff provides no evidence that he went to Internal Affairs, the Civilian Complaint Review Board, or otherwise reported Kelly, or that Kelly threatened him in any way during the July arrest.

**V. August 16, 2013 Arrest (Twenty-Second through Twenty-Fifth Claims - Defendants Kelly and Bohringer)**

*A. False Arrest (August 16, 2013)*

There is a genuine dispute of material fact regarding the "pertinent events" and probable cause that led to Plaintiff's arrest for marijuana possession and sale. *Jackson*, 939 F. Supp. 2d at 249. Plaintiff claims that the "[p]olice came over to [him], put the handcuffs on [him], and locked [him] up for no reason." (Blount Dep., 265:12-19, 274:5-8.) Plaintiff also denies that he was near the Pontiac or engaging in the drug transactions that Defendant Bohringer purportedly saw. Therefore, Defendant Bohringer and Kelly's motion for summary judgment is denied as to the Twenty-Second Claim of the Amended Complaint alleging false arrest on August 16, 2013.

*B. Illegal Stop and Frisk (August 16, 2013)*

As with the June 8, 2013 stop and frisk, Plaintiff only alleges harms relating to the discovery of incriminating evidence and nothing separately resulting from the alleged deprivation of liberty that occurred on August 16, 2013. For the reasons stated in Section III(A), Defendants Kelly and Bohringer's motion for summary judgment is granted as to the Twenty-Fifth Claim of the Amended Complaint alleging an illegal stop and frisk on August 16, 2013. (*See* Blount Dep., 283:6-12, 285:1-7, 285:21-22, 286:6-7, 296:19-21; Am. Compl. ¶¶ 78-79, 224-228.)

*C. Malicious Prosecution (August 16, 2013)*

*i. Detective Kelly*

Plaintiff presents no evidence that Defendant Kelly was involved in initiating the prosecution against him stemming from the August 16, 2013 arrest. For the reasons stated in Section III(D)(ii), Defendant Kelly's motion for summary judgment is granted as to Twenty-Fourth Claim of the Amended Complaint alleging malicious prosecution in connection with the August 16, 2013 arrest.

### ii. Detective Bohringer

Plaintiff, however, presents evidence that Defendant Bohringer signed a sworn criminal complaint relating to Plaintiff's August 16, 2013 arrest. (*See* Dkt. 57-27.) For the reasons stated in Section III(D)(i), Defendant Bohringer's motion for summary judgment is denied as to the Twenth-Fourth Claim of the Amended Complaint alleging malicious prosecution in connection with the August 16, 2013 arrest.

### D. Malicious Abuse of Process (August 16, 2013)

As with his other malicious abuse of process claims, Plaintiff alleges that Defendants Bohringer and Kelly's collateral objective in arresting and prosecuting him was to falsely inflate the NYPD's arrest and stop-and-frisk statistics. For the reasons stated in Section II(D), Defendants Kelly and Bohringer's motion for summary judgment is granted as to the Twenty-Third Claim of the Amended Complaint alleging malicious abuse of process in connection with the August 16, 2013 arrest.[17]

## VI.  Equal Protection (Twenty-Seventh Claim - All Defendants)

Plaintiff alleges that "Defendants unlawfully singled out Plaintiff and violated his First, Fourth, Fifth, and Fourteenth Amendment rights, in part because of his race, age, and gender", by "plac[ing], or caus[ing] to be placed, Plaintiff's home address on an N.Y.P.D. Tactical Plan." (Am. Compl. ¶¶ 235-36.) As an initial matter, Plaintiff fails to establish that Defendants were personally involved in putting Plaintiff on the Tactical Plan. For example, the only Tactical Plan that Plaintiff provides, from June 8, 2013, states that it was prepared by Sergeant Forgione, not any of

---

[17] The Court notes that, in his deposition, Plaintiff states that he called Internal Affairs about Defendant Kelly after the July 5, 2013 arrest. (Blount Dep., 255:16-256:8.) While this could potentially constitute "personal animus" to establish a malicious abuse of process claim related to the subsequent August 16, 2013 arrest, Plaintiff provides no evidence of his alleged report to Internal Affairs between July 5, 2013 and August 16, 2013.

Defendants. (Dkt. 58-3, at 2.) "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Allen*, 665 F. App'x at 14. While Defendants admit that they *executed* Tactical Plans at the Premises, there is no evidence that they prepared or put Plaintiff on these Tactical Plans. (*See, e.g.*, Kelly Dep., at 27:23-28:7; Dkt. 58-3, at 2.)

Additionally, "[t]o state a race[, age, or gender]-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race[, age, or gender]." *Brown*, 221 F.3d at 337. There are "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause. A plaintiff could point to a law or policy that expressly classifies persons on the basis of race[, age, or gender]. Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Id.* (citations omitted). Plaintiff cannot establish intentional discrimination under any of the available frameworks. While the Court is "not unmindful of the impact of [these] police action[s] on community relations" and is "not blind to the sense of frustration" and fear that Plaintiff expressed at his deposition, *id.* at 339; (*see* Blount Dep., at 207:16-18 ("It was one point I was like do I have to paint myself white because I was willing to do anything to [get the police to] just leave me alone."))[18], there is no evidence in the record that his placement on the Tactical Plan was motivated by race, age, or

_____

[18] "I can't even go be with [my son]. I'm scared [the NYPD is] going to see me and beat me. I can't beat NYPD. I don't know what else to do. Every time they see me I'm going through this. . . . Like I died. Then what's going to happen. I mean this is going to get swept under the rug. And nobody talk about it. Then they are going to do it with my kid. That's why I'm here. . . . It has to stop. They not coming to my house just to play games. . . . People see the recordings and all that. They still don't do nothing. I still got to wait two, three years to go to court. By that time I might be dead." (Blount Dep., at 95:3-96:22.)

gender-based animus. In fact, it appears that Plaintiff took no discovery related to the use of Tactical Plans—statistical, demographic, or otherwise—necessary to support his equal protection claim. Therefore, Defendants' motion for summary judgment is granted as to the Twenty-Seventh Claim of the Amended Complaint alleging an equal protection violation based on all five arrests.[19]

## VII. Intentional Infliction of Emotional Distress (Third, Eighth, Fifteenth, Twenty-First, and Twenty-Sixth Claims - All Defendants)

In addition to his federal claims, Plaintiff also alleges intentional infliction of emotional distress ("IIED") under New York law against each Defendant for each arrest. (Am. Compl. ¶¶ 107-111 (first arrest), 134-38 (second arrest), 170-74 (third arrest), 202-06 (fourth arrest), 229-33 (fifth arrest).)

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Moore v. City of New York*, 219 F. Supp. 2d 335, 338 (E.D.N.Y. 2002) (citing *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)). However, "the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory." *Brewton v. City of New York*, 550 F. Supp. 2d 355, 370

---

[19] In his Amended Complaint, Plaintiff also makes a separate, vague claim of "deprivation of federal civil rights" on the basis that Defendants "deprived Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States by, *inter alia*, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and in violation of 42 U.S.C. § 1983." (Am. Compl. ¶¶ 92-100.) This count is dismissed as duplicative. *White*, 2018 WL 1545676, at *6 ("To the extent that Plaintiff attempts to assert a separate substantive due process claim based on the same conduct that underlies his Fourth[, Fifth, or Fourteenth] Amendment claims for false arrest[, abuse of process, unlawful search,] and malicious prosecution, his claim is dismissed as duplicative."). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks omitted).

(E.D.N.Y. 2008) (collecting cases); *see also Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) ("[T]he New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability.  All four Appellate Division courts have answered the question and held that it cannot.") (citation and quotation marks omitted) (collecting cases).  "[A] standalone claim may be available under New York law" only where a plaintiff "can show that there are elements of an intentional infliction of emotional distress claim which do not completely overlap with other traditional torts[.]"  *Warr v. Liberatore*, 270 F. Supp. 3d 637, 654 (W.D.N.Y. 2017) (citing *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016)).

In this case, Plaintiff "has not alleged any element of an intentional infliction of emotional distress claim that is different or in addition to what is recoverable under the traditional torts alleged", and, therefore, Plaintiff's claim for intentional infliction of emotional distress is duplicative and must be dismissed.  *Id.* at 655.  Plaintiff argues that his IIED claim is proper, in part, "because of the officers' excessive use of force and the injuries resulting therefrom", *id.* at 654; however, his claims resulting from his arrests "are wholly encompassed in the other intentional torts" alleged in Plaintiff's surviving claims, *i.e.*, false arrest, unlawful search and seizure, malicious prosecution, and use of excessive force, *id.* at 654-55 (dismissing IIED where plaintiff alleged false arrest and excessive force); *see also Brewton*, 550 F. Supp. 2d at 370 (holding that even if the plaintiff's false arrest qualified as extreme and outrageous, "to the extent that the plaintiff contends []he suffered emotional distress as a result of the false arrest, [his] claim is encompassed entirely within other tort remedies and is thus precluded under New York law") (internal quotation marks omitted); *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 338 (S.D.N.Y. 2017) ("[B]ecause Plaintiff is also pursuing claims for malicious prosecution against

[Defendants], liability for intentional infliction of emotional distress based upon their conduct is foreclosed as a matter of law[.]").   Therefore, Defendants' motion for summary judgment is granted as to the Third, Eighth, Fifteenth, Twenty-First, and Twenty-Sixth Claims of the Amended Complaint alleging IIED with respect to all five arrests.

## VIII.   Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Hartline v. Gallo,* 546 F.3d 95, 102 (2d Cir. 2008) (citation and internal quotation marks omitted).   "As qualified immunity is an affirmative defense, the defendants bear the burden of proof." *Matthews*, 889 F. Supp. 2d at 432 (citing *Lore v. City of Syracuse,* 670 F.3d 127, 149 (2d Cir. 2012)).   In order to deny qualified immunity to a government official, "a court must find both that (1) the plaintiff has alleged facts that comprise a violation of a constitutional right, and (2) the violated constitutional right was "clearly established" at the time of the official's alleged misconduct."   *Id.* (quoting *Pearson v. Callahan,* 555 U.S. 223, 232, 236 (2009)).   Moreover, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir. 2007).   "That is, officers are entitled to qualified immunity if 'officers of reasonable competence could disagree' as to legality of their action." *Felmine*, 2011 WL 4543268, at *9 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).   The objective reasonableness inquiry of whether the shield of qualified immunity applies to a defendant's conduct is a mixed question of law and fact. *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir. 2004).

First, as stated above, Plaintiff's surviving claims allege plausible allegations of unreasonable search and seizure, false arrest, excessive force, and malicious prosecution. Second, "the law was clearly established that [Plaintiff] had a constitutional right to be free from arrest without probable cause", *Gilles v. Repicky,* 511 F.3d 239, 247 (2d Cir. 2007), and from excessive force, *Henry v. Dinelle*, 929 F. Supp. 2d 107, 128 (N.D.N.Y. 2013), *aff'd*, 557 F. App'x 20 (2d Cir. 2014). At this stage, the few undisputed facts do not support a finding that Defendants' actions were "objectively reasonable" with respect to Plaintiff's remaining claims. Therefore, Defendants are not entitled to qualified immunity.

## CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is granted in part and denied in part.

Summary judgment is DENIED as to the following claims, which will proceed to trial:

- Second Claim – Malicious Prosecution as to Defendant Nelson based on August 11, 2012 Arrest
- Fourth Claim – False Arrest as to Defendant Lohman based on September 28, 2012 Arrest
- Sixth Claim – Malicious Prosecution as to Defendant Lohman based on September 28, 2012 Arrest
- Seventh Claim – Illegal Stop and Frisk as to Defendant Lohman based on September 28, 2012 Arrest
- Ninth Claim – False Arrest as to Defendants Kelly and Bohringer based on June 8, 2013 Arrest
- Eleventh Claim – Malicious Prosecution as to Defendant Kelly based on June 8, 2013 Arrest
- Thirteenth Claim – Excessive Force as to Defendants Kelly and Bohringer based on June 8, 2013 Arrest
- Sixteenth Claim – False Arrest as to Defendant Kelly based on July 5, 2013 Arrest
- Eighteenth Claim – Malicious Prosecution as to Defendant Kelly based on July 5, 2013 Arrest
- Twentieth Claim – Excessive Force as to Defendant Kelly based on July 5, 2013 Arrest
- Twenty-Second Claim – False Arrest as to Defendants Kelly and Bohringer based on August 16, 2013 Arrest
- Twenty-Fourth Claim – Malicious Prosecution as to Defendant Bohringer based on August 16, 2013 Arrest

Summary judgment is GRANTED as to the following claims, which are dismissed:

- First Claim – Deprivation of Federal Civil Rights as to all Defendants
- Third Claim – Intentional Infliction of Emotional Distress as to Defendant Nelson based on August 11, 2012 Arrest
- Fifth Claim – Malicious Abuse of Process as to Defendant Lohman based on September 28, 2012 Arrest
- Eighth Claim – Intentional Infliction of Emotional Distress as to Defendant Lohman based on September 28, 2012 Arrest
- Tenth Claim – Malicious Abuse of Process as to Defendants Kelly and Bohringer based on June 8, 2013 Arrest
- Eleventh Claim – Malicious Prosecution as to Defendant Bohringer based on June 8, 2013 Arrest
- Twelfth Claim – Illegal Stop and Frisk as to Defendants Kelly and Bohringer based on June 8, 2013 Arrest
- Fifteenth Claim – Intentional Infliction of Emotional Distress as to Defendants Kelly and Bohringer based on June 8, 2013 Arrest
- Seventeenth Claim – Malicious Abuse of Process as to Defendant Kelly based on July 5, 2013 Arrest
- Nineteenth Claim – Illegal Stop and Frisk as to Defendant Kelly based on July 5, 2013 Arrest
- Twenty-First Claim – Intentional Infliction of Emotional Distress as to Defendant Kelly based on July 5, 2013 Arrest
- Twenty-Third Claim – Malicious Abuse of Process as to Defendants Kelly and Bohringer based on August 16, 2013 Arrest
- Twenty-Fourth Claim – Malicious Prosecution as to Defendant Kelly based on August 16, 2013 Arrest
- Twenty-Fifth Claim – Illegal Stop and Frisk as to Defendants Kelly and Bohringer based on August 16, 2013 Arrest
- Twenty-Sixth Claim – Intentional Infliction of Emotional Distress as to Defendants Kelly and Bohringer based on August 16, 2013 Arrest
- Twenty-Seventh Claim – Equal Protection as to all Defendants

The parties shall submit a Joint Pretrial Order by August 31, 2018. A pretrial conference will be scheduled thereafter.

SO ORDERED.

 /s/ Pamela K. Chen_____
PAMELA K. CHEN
United States District Judge

Dated: July 10, 2018
 Brooklyn, New York